IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

SUPERIOR VENDING, INC.,

                    Plaintiff,                    OPINION AND ORDER

      v.                                          09-cv-567-slc

DICK'S BAR OF HUDSON, INC.,
d/b/a DICK'S BAR AND GRILL,

                    Defendant.

---

Victor Hugo writes that in 15th Century Paris, rogues who lived on the wrong side of the law judged each other by their own strict rules in the Court of Miracles.[1]  That may have been a better venue for this lawsuit than federal court, because plaintiff seeks to enforce a contract that countenances illegal payouts from video poker machines.  Superior Vending, Inc., believes that it has been double-crossed by Dick's Bar and Grill; this appears to be true but it is irrelevant, at least in this court: as Dick's Bar unabashedly proclaims, its contract with Superior is unenforceable because it is essentially an agreement to split unlawfully obtained money. Dick's Bar has moved for summary judgment on this basis.  *See* dkt. 15.

From the parties' agreement to set up, operate, maintain and collect the proceeds from five video poker machines is illegal under Wisconsin law, the entire contract is void and unenforceable.  Superior is not entitled to sever the illegal provisions and enforce the remainder of the contract relating to 6 legal amusement machines.  Therefore, I am granting Dick's Bar's motion for summary judgment.

From the parties' submissions, I find the following facts to be material and undisputed:

---

[1] Hugo, *Notre Dame de Paris*, 2nd Book, Chap. VI, "The Broken Jug."

FACTS

## I.  The Parties

Plaintiff Superior Vending, Inc. (Superior) is a Minnesota corporation with offices in Inver Grove Heights, Minnesota.  Superior leases vending and amusement machines to restaurants and bars in eastern Minnesota and western Wisconsin.  It purchases its machines from various distributors in the Midwest and has a warehouse in Spring Lake Park, Minnesota. Defendant Dick's Bar of Hudson, Inc. (Dick's Bar) is a Wisconsin corporation operating a restaurant and bar in Hudson, Wisconsin.

One popular type of amusement machine that Superior leases to restaurants and bars in western Wisconsin is the video poker machine, which typically pays out a percentage of the amount that customers put into them (60% on average).  Under Superior's business model, Superior's clients pay the taxes, then Superior and its clients split evenly the net revenue from the video machines that remains after the payouts.  Superior and its clients also typically split evenly the net revenues from any other amusement machines.  For approximately four years, Superior has been registered with the State of Wisconsin Department of Revenue and has been paying sales and use taxes to the state on a monthly basis.

## II.  The Contract

Andrew Schmitz, president and owner of Superior, wanted to place amusement machines in Dick's Bar because of the bar's excellent location in Hudson, near the Minnesota border.  In the summer of 2008, Paul Kremer, the president of Dick's Bar, wanted to sell the Hammond Hotel because it was losing money.  Schmitz was so interested in obtaining Dick's Bar's business

2

for Superior that he was willing to consider purchasing the Hammond Hotel to secure an exclusive contract.

On October 16, 2008, Schmitz sent a letter of intent to Kremer about buying the Hammond Hotel. Schmitz stated his intent to offer Kremer $150,000 for the purchase of the land, building and business in exchange for Dick's Bar entering into a 60-month contract with Superior for vending and amusement machines. Along with the letter of intent, Schmitz paid Kremer $2,000 in earnest money toward the purchase of the hotel. Schmitz and Kremer later met and negotiated the terms of a 5-year service agreement for amusement machines.

Schmitz had a preprinted form contract with blanks to fill in, including a section for the parties to hand-write a list of equipment to be installed and the percentage of each machine's proceeds due back to Superior, less sales tax. Schmitz discussed the contract in detail with Kremer, who requested revisions that Schmitz made in handwriting. On December 15, 2008, Kremer and Schmitz executed the contract, which provides Superior with the exclusive right to place 11 vending and amusement machines, including five video poker machines, in Dick's Bar for 60 months, starting on June 20, 2009 "or when existing contract expires with current operator." The June 20 commencement date was selected because Kremer had told Schmitz that Dick's Bar had an existing contract with Twin States Music, Inc.–Superior's bitter rival–that would expire automatically on June 19, 2009. In the contract with Superior, Dick's Bar represents that it was not a party to any other contract that was inconsistent with the exclusivity provision of the contract with Superior.

The parties anticipated that 90% of the total revenue to be generated by the machines placed by Superior in Dick's Bar would come out of the five video poker machines; only 10%

would derive from the six non-gambling machines, namely a dart board, three juke boxes, and three other video and touchscreen games. The parties agreed to split the net revenues from all eleven machines equally. The section that allowed the parties to write in the list of machines and the revenue split starts with this entry:

EQUIPMENT          % DUE COMPANY LESS SALES TAX

(5) Video pokers          :          50% after payouts

*See* Weintraut Aff.,dkt. 36, Exh. 5 at 1.

The contract requires Superior to comply with all federal, state, local or other laws and regulations applying to vending and amusement machines. It also states that Superior would obtain any permits and registrations required for the machines. Schmitz did not attempt to secure permits or licenses from the City of Hudson. (The parties dispute whether Kremer told Schmitz that he already had secured the required permits and licenses from the City of Hudson and would continue to pay any required fees.)

As of December 15, 2008, the City of Hudson had the following ordinance (§ 96-1) relating to amusement machines:

> B. License required. Every person being an owner of amusement devices or mechanical musical devices, as herein defined, shall make application to the Council for a license. The license fee for the owners' license shall be $25 per year and shall be paid to the clerk at the time of filing the application for such license. . . . Such license shall be granted only to persons qualified to do business within the state. . . .

> C. Registration of devices. Every person owning any amusement device or mechanical device and having obtained a license under this section permitting the ownership of such device, in addition to the license requirements, shall register such device with the Clerk. . . .

4

Superior and Dick's Bar agreed to a liquidated damages provision in the event that Dick's Bar breached the contract. Under the contract, Superior was entitled to recover the average net revenues prior to the breach for the remainder of the 60-month term of the contract, plus attorney fees and costs.

### III. Related Third-Party Contracts

On May 3, 2008, Dick's Bar entered into a 3-year lease agreement with Twin States for "power play" video poker machines. Twin States is located in Hudson and leases vending and amusement machines to clients in eastern Minnesota and Wisconsin. It has been one of Superior's main competitors for the past four years. Superior has approximately 12 clients with video poker machines in western Wisconsin, while Twin States has approximately 200 clients with video poker machines in Wisconsin, including clients in western Wisconsin.

On December 24, 2008, Kremer signed a purchase agreement with Hammond Eggs, LLC, of which Schmitz was a member, for the sale of the Hammond Hotel. Schmitz and his partners in Hammond Eggs, LLC performed their obligations by closing on the purchase of the Hammond Hotel on December 31, 2008.

On February 9, 2009, after selling the Hammond Hotel, Dick's Bar executed a second contract with Twin States that mirrored the May 2008 contract and conflicted with Dick's Bar's December 15, 2008, contract with Superior. The February 2009 contract grants Twin States the exclusive right to place video poker machines at Dick's Bar for 36 months. Kremer initialed the bottom of each of the four pages and signed the last page of the February 2009 contract. In subsequent deposition testimony, Kremer claimed that he thought that he just was verifying

that Twin States had delivered another machine to Dick's Bar, not that he was signing a new contract with Twin States. Kremer did not tell Twin States about his letter of intent or contract with Superior, nor did he not tell Schmitz about the February 2009 contract with Twin States.

In deposition testimony, Kremer further claimed that on April 7, 2009, he sent a letter to Twin States to cancel the "existing lease which expires June 19th, 2009." However, Dick's Bar has yet to produce to anyone a copy of this April 7 letter, or a copy of any contract with Twin States or another vendor that expired June 19, 2009. Kremer claims that he threw away the April 7 letter. Twin States then provided Dick's Bar with a copy of the lease agreement it signed on May 3, 2008. Dick's Bar did not have a copy of that agreement when it entered into the December 2008 contract with Superior.

## IV. The Alleged Breach

Dick's Bar never received or used any machines from Superior. On December 20, 2008, Superior ordered five video poker machines from Fun Company to place at Dick's Bar pursuant to the contract. Superior paid for the machines on March 6, 2009, and Fun Company delivered them to Arena Sports Bar in La Crosse, Wisconsin in mid-March, 2009. By April 2009, Superior also had purchased the 6 other machines. Schmitz originally had intended to have all 11 machines delivered to Dick's Bar before June 20, 2009. However, he testified that he became concerned because Kremer "wouldn't get back to me, he wouldn't return my calls."

On June 11, 2009, an attorney for Dick's Bar sent Superior's attorney the following email:

> Paul Kremer would like to cancel the [Contract]. Paul wants to
> avoid a dispute with his current vendor, who now claims that he

is still under contract with them.  Please discuss with your client and see whether he is willing to release Mr. Kremer from the proposed contract, which has not yet begun.  I will await your reply.  Thank you.

Superior did not respond to this email in writing.  Sometime after the email but before June 20, 2009, Schmitz met with Kremer at Dick's Bar to discuss their contract.  At the meeting, Kremer told Schmitz that he would rather not do business with him and was not going to allow Superior to operate machines in Dick's Bar.  Kremer told Schmitz that he had another contract with Twin States, he was not going to go with Superior and he was going to stay with Twin States.  Kremer suggested that Superior might have an opportunity to contract with Dick's Bar a year from then, but Schmitz indicated that he was not interested in such an offer.  Schmitz told Kremer that he wanted to go forward with the existing contract.  When Kremer offered Schmitz $5,000 to release Dick's Bar from the contract, Schmitz refused and stated that he did not know what he was going to do.  (Schmitz avers that he made this statement in reference to filing a lawsuit.  According to Schmitz, Superior always intended to perform the contract if Dick's Bar would have allowed it.  The parties dispute whether Kremer told Schmitz that he would reject delivery of the machines.)

On September 15, 2009, Superior commenced a breach of contract action against Dick's Bar in this court.  Prior to filing suit, Superior did not serve a notice of breach or notice of termination pursuant to Section V of the contract.  Dick's Bar admitted in its answer to the complaint that "Superior Vending, Inc. was notified before the effective date that Dick's Bar & Grill was rescinding the contract."

## ANALYSIS

Dick's Bar asserts that it is entitled to summary judgment on Superior's breach of contract claim on three alternative grounds:  1) its contract with Superior is void as a matter of law because it was a contract for illegal activity; 2) Superior breached the contract by failing to obtain licenses and permits required under municipal ordinances; 3) this action is not ripe because the parties' contract has not yet come into effect; and 4) Superior cannot recover liquidated damages because it failed to perform a condition precedent of notifying Dick's Bar of its termination of the contract.

Superior responds that enforcing its contract with Dick's bar is consistent with legislative intent and in the public interest.  Alternatively, it argues that if certain portions of the contract are found to be illegal, then the contract should be severed and upheld with respect to the terms relating to non-video poker machines.  Superior contends that its claim is ripe and that there are genuine issues of material fact about which party accepted responsibility for obtaining required licenses and permits and whether Superior properly terminated the contract.  The parties agree that Wisconsin state law applies.

## I.  Summary Judgment Standard

Summary judgment is proper where there is no showing of a genuine issue of material fact in the pleadings, depositions, answers to interrogatories, admissions and affidavits, and where the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "'A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party.'"  *Sides v. City of Champaign*, 496 F.3d 820, 826

8

(7th Cir. 2007) (quoting *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 692 (7th Cir.

2005)).  In determining whether a genuine issue of material facts exists, the court must construe

all facts in favor of the nonmoving party.  *Squibb v. Memorial Medical Center*, 497 F.3d 775, 780

(7th Cir. 2007).  Even so, the nonmoving party must "do more than simply show that there is

some metaphysical doubt as to the material facts."  *Matsushita Electric Indus. Co. v. Zenith Radio

Corp.*, 475 U.S. 574, 586 (1986).  The party that bears the burden of proof on a particular issue

may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations,

that there is a genuine issue of material fact that requires a trial.  *Hunter v. Amin*, 538 F.3d 486,

489 (7th Cir. 2009) (internal quotation omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242 (1986).


## II.  Regulation of Gambling in Wisconsin

As originally adopted in 1848, Article IV, § 24 of the Constitution of the State of

Wisconsin prohibited the legislature from authorizing gambling.  *See* Wisconsin Legislative

Reference Bureau, Budget Brief 99-6, *Decriminalization of Video Gambling*, Nov. 1999, at 1.  Since

1965, Wisconsin voters have ratified a series of constitutional amendments legalizing

sweepstakes, charitable bingo, charitable raffles, a state lottery and parimutuel on-track betting.

*Id.*; *State v. Gonnelly*, 173 Wis. 2d 503, 511, 496 N.W.2d 671, 674 (Ct. App. 1992).  *See also*

Wis. Stat. Ch. 562 ("Regulation of Racing and On-Track Pari-Mutuel Wagering"); Ch. 563

("Bingo and Raffle Control"); and Ch. 565 ("Lottery").  However, voters have rejected efforts

to legalize video poker machines and other forms of off-reservation video gambling.  Budget Brief

99-6, at 2.

Chapter 945 of the Wisconsin Statutes regulates gambling and gambling machines, which are defined as "a contrivance which for a consideration affords the player an opportunity to obtain something of value, the award of which is determined by chance, even though accompanied by some skill and whether or not the prize is automatically paid by the machine." § 945.01(3). A "gambling machine" does not include any "amusement device if it rewards the player exclusively with one or more nonredeemable free replays for achieving certain scores and does not change the ratio or record the number of the free replays so awarded." *Id.* In *State v. Hahn*, the Wisconsin Court of Appeals clarified what type of machines may violate the statute, determining that "gambling machines" must pay out money or something of value. 203 Wis. 2d 450, 457, 553 N.W.2d 292, 294 (Ct. App. 1996) (*Hahn I*); *see also State v. Hahn*, 221 Wis. 2d 670, 681-83, 586 N.W.2d 5, 11-12 (Ct. App. 1998) (*Hahn II*) (holding definition of gambling machine not unconstitutionally vague). The appellate court held that video poker machines are not "gambling machines," *per se*, because they *could* be used purely for amusement purposes. *Id.* Thus, "[p]ayouts are the act that turns amusement machines into illegal gambling machines." *Kramer v. Village of North Fond du Lac*, 384 F.3d 856, 864 (7th Cir. 2004).

Until 1999, it was a Class E felony to participate in the earnings of, operate, set up, collect proceeds from, manufacture or sell machines designed exclusively for gambling purposes. §§ 945.03 and 945.05 (1999). In 1999, the Wisconsin legislature amended these statutes to provide the following optional financial penalties with respect to 5 or fewer gambling machines. These statutes provide:

**945.03. Commercial gambling**

(1m) Whoever intentionally does any of the following is engaged in commercial gambling and, except as provided in sub. (2m), is guilty of a Class I felony:

\*   \*   \*

(e) Sets up for use for the purpose of gambling or collects the proceeds of any gambling machine;

\*   \*   \*

(2m) If the violation of sub. (1m) involves the possession, operation, setup, collection of proceeds, participation in earnings or maintenance of, or involves acting as the custodian of anything of value bet or offered to be bet on, not more than 5 video gambling machines on premises for which a Class "B" or "Class B" license or permit has been issued under ch. 125, the person may be penalized as follows:

(a) If the violation involves one video gambling machine, the person may be required to forfeit not more than $500.

(b) If the violation involves 2 video gambling machines, the person may be required to forfeit not more than $1,000.

(c) If the violation involves 3 video gambling machines, the person may be required to forfeit not more than $1,500.

(d) If the violation involves 4 video gambling machines, the person may be required to forfeit not more than $2,000.

(e) If the violation involves 5 video gambling machines, the person may be required to forfeit not more than $2,500.

**945.05. Dealing in gambling devices**

(1) Except as provided in subs. (1e)(b) and (1m), whoever manufactures, transfers commercially or possesses with intent to transfer commercially either of the following is guilty of a Class I felony:

\*   \*   \*

(b) Any device which he or she knows is designed exclusively for gambling purposes . . .

11

In addition to decriminalizing video gambling, the Wisconsin legislature has taken steps to limit the number of state agencies with the authority to enforce § 945.03(2m).  *See* § 165.70(1m) (amended in 2003 to prevent Department of Justice from enforcing § 945.03(2m)); § 175.38(2) (same with respect to state and local law enforcement officers).  Currently, only special agents of the Department of Revenue may enforce the statute.  § 73.03.

Federal law also makes it illegal to transport gambling devices across state lines into a state where such devices are illegal, unless that state has enacted an exemption.  15 U.S.C. § 1172.  Wisconsin has exempted only Sturgeon Bay, Manitowoc, Marinette, Superior and La Crosse from § 1172.  § 945.13.

## IV.  The Legality of the Parties' Contract

Dick's Bar asserts that because its contract with Superior provides for the set up, operation, maintenance and collection of proceeds from illegal gambling machines, the entire contract is void and unenforceable.  The parties do not dispute that the video poker machines Superior was going to place in Dick's Bar made "payouts," and payouts are the act that turns amusement machines into illegal gambling machines under Wisconsin law.  *Kramer*, 384 F.3d at 864; *Hahn II*, 221 Wis. 2d at 681-83, 586 N.W.2d at 11-12; *Hahn I*, 203 Wis. 2d at 457, 553 N.W.2d at 294.

Nonetheless, Superior argues that the *Hahn* cases cannot be relied upon to determine the legality of video poker machines in this contract case because *Hahn I* and *II* involved criminal prosecutions and were decided before the legislature decriminalized video gambling. This argument is unavailing.  In both *Hahn I* and *II*, the court of appeals interpreted the definition

12

of "gambling machine" in  § 945.01(3), which was not affected by the 1999 amendments.  The

fact that the defendant in *Hahn I* and *II* was convicted of a crime under the old statutes (versus

being assessed with a civil forfeiture) was irrelevant to the court's analysis of § 945.01(3).

Although Wisconsin courts generally seek to enforce contracts rather than set them aside,

a contract is illegal and unenforceable where its formation or performance is forbidden by

statute.  *Abbott v. Marker*, 295 Wis. 2d 636, 641-42, 722 N.W.2d 162, 164-65 (Ct. App. 2006);

*Hiltpold v. T-Shirts Plus, Inc.*, 98 Wis. 2d 711, 716-17, 298 N.W.2d 217, 220 (Ct. App. 1980).

Similarly, the Restatement (Second) of Contracts § 178 (1981) provides that a promise may be

unenforceable on public policy grounds if "legislation provides that it is unenforceable or the

interest in its enforcement is clearly outweighed in the circumstances by a public policy against

the enforcement of such terms."  The Restatement also states that in weighing a public policy

against the enforcement of a term, the following factors should be considered:  (1) the strength

of that policy as manifested by legislation or judicial decisions; (2) the likelihood that a refusal

to enforce the term will further that policy; (3) the seriousness of any misconduct involved and

the extent to which it was deliberate; and (4) the directness of the connection between that

misconduct and the term.  *Id.*; *Blossom Farm Products Co. v. Kasson Cheese Co., Inc.*, 133 Wis. 2d

386, 395, 395 N.W.2d 619, 622 (Ct. App. 1986) (adopting balancing test).

Despite the general rule, Wisconsin courts have explained that not all contracts in

violation of a statute are void as a matter of course.  *Baierl v. McTaggart,* 245 Wis. 2d 632, 642-

43, 629 N.W.2d 277, 282 (Wis. 2001); *Chapman v. Zakzaska*, 273 Wis. 64, 66, 76 N.W.2d 537,

538 (Wis. 1956).  *See also Federal Deposit Ins. Corp. v. Dalba*, No. 89-C-712-S, 1990 WL 43750,

*5 (W.D. Wis. Feb. 27, 1990) (noting same).  The Wisconsin Supreme Court has cautioned that

13

it is "grave error to regard it as a merely arbitrary rule applicable to all contracts which are prohibited by statute." *Posnanski v. Hood*, 46 Wis. 2d 172, 181, 174 N.W.2d 528, 532 (Wis. 1970) (citation omitted). "The controlling analysis in determining whether a statutory or regulatory violation renders a contract unenforceable is the intent underlying the provision that was violated." *Baierl*, 245 Wis. 2d at 643, 629 N.W.2d at 283 (citations omitted).

Citing this line of cases, Superior contends that while video gambling technically remains illegal in Wisconsin in the absence of a constitutional amendment, the legislature's decriminalization and limited enforcement of video gambling activities constitutes *de facto* legalization and allows this court to enforce contracts related to it. Superior claims that the amendments make clear that the legislature intended to license and tax gambling machines, not to punish those who sell, possess or operate them. In further support of this argument, Superior cites a 1999 Budget Veto Message, in which Governor Tommy Thompson stated to the Assembly that "gambling machines should be licensed, regulated and taxed in Wisconsin." Dkt. 36, Exh. 20 at 12.

Although the legislature and former Governor Thompson may well have felt that imprisonment was an inappropriate and unduly harsh penalty for certain gambling activities, these opinions do not change the fact that gambling machines, as defined in § 945.01(3), are illegal, and the possession and operation of these machines carry civil forfeiture penalties. As Dick's Bar points out, when read as a whole, Governor Thompson's 1999 Budget Veto Message makes this fact clear:

> 5. Video Gambling Machines - Currently there is inconsistent enforcement of video gambling machine laws across the state. In response, the Legislatures has now reduced the penalty for having five or fewer of these machines in a tavern. *While operating gaming*

14

> *machines is illegal*, it should not rise to the level of imprisonment, especially in an already crowded prison system.  I also intend to come back with a proposal to reduce the number of gaming machines that would fall under the misdemeanor penalty from five to three.  This change should create more uniformity in the prosecution of minimal gaming activity and *make the penalty fit the crime*.  In the future, I still feel gaming machines should be licensed, regulated and taxed in Wisconsin.

Dkt. 36, Exh. 20 at 12 (emphasis added).

Thus, although Governor Thompson expressed his wish to legalize gambling machines in the future, he makes clear that this was not the intended result of the amendments to chapter 945; indeed, such a result was impossible in the face of Wisconsin's constitutional prohibition against video gambling.

The contract in ths case provides for the set up, operation, maintenance and collection of proceeds from five video poker machines in Dick's Bar.  These particular activities are expressly prohibited by statute and are punishable by civil fines.  The legislature's decision to reduce the penalties and only minimally enforce the statutes does not change this fact. Wisconsin has made clear that "[a] contract is illegal where its formation or performance is expressly forbidden by a civil or criminal statute or where a penalty is imposed for doing the act agreed upon."  *Hiltpold*, 98 Wis. 2d at 716-17, 298 N.W.2d at 220.[2]  *See also Abbott*, 295 Wis. 2d at 641, 722 N.W.2d at 164-65 (citing same); *cf. Kleewood, Inc. V. Hart Design & Mfg., Inc.*, 297 Wis. 2d 805, 817, 727 N.W.2d 87, 93 (Ct. App. 2006) (distinguishing *Hiltpold* and finding

---

[2] In another futile argument, Superior asserts that *Hiltpold* is distinguishable because the contract at issue in that case (the sale of a T-shirt franchise) violated a statute providing both criminal *and* civil penalties.  However, as discussed, a contract is illegal where its formation or performance is prohibited by *either* a civil *or* criminal statute.

that contract with employer-paid employment agent who failed to fulfill registration requirement was legal because there were no express sanctions or penalties for violation).

Superior attempts to show that its contract with Dick's Bar is more similar to the contract enforced in *Chapman* than the contract found unenforceable in *Abbott*. In *Chapman*, the court refused to void the sale of an automobile that was in violation of speedometer regulations because the illegality did not "permeate the contract so as to furnish the reason for and the foundation upon which it rests." However, as Dick's Bar points out, the court in *Chapman* specifically distinguished the statute relating to speedometer readings from those governing gambling:

> The statute does not purport to create a new civil violation, nor to prohibit the sale of used cars. It is unlike those which, for instance, prohibit gambling, the sale of contraband goods, bargains made in violation of Sunday laws, etc. Unlike the situations in those cases, the illegality in the instant case does not permeate the contract so as to furnish the reason for and the foundation upon which it rests so as to make applicable the rule so generally and sometimes unnecessarily broadly stated that all contracts prohibited by statute are void and unenforceable.

273 Wis. 2d at 68, 76 N.W.2d at 539.

In this case, the very services that the parties contracted for are illegal. In other words, the illegal activity furnishes the very reason for the contract. *Id.*

In *Abbott*, the court of appeals invalidated a contract between a lawyer and a non-lawyer for the payment of client referral fees because it directly contravened Wis. Stat. § 757.295, which prohibits a person from soliciting legal business for an attorney and prevents an attorney from employing anyone for that purpose, as well as Wis. Stat. § 757.45, which makes it illegal for an attorney to split legal fees with non-attorneys. 295 Wis. 2d at 641-45, 722 N.W.2d 164-

16

66. Superior argues that *Abbott* is distinguishable because §§ 757.295 and 757.45 explicitly bar the making of such agreements, whereas the video gambling statutes do not contemplate agreements for the placement and operation of illegal gambling machines.

I disagree with Superior's characterization of the statutes at issue in *Abbott*. The anti-solicitation statutes, like the video gambling statutes, prohibit an activity or service. Apparently recognizing this fact, the court in *Abbott* stated that "[i]t is *implicitly* declared in Wisconsin, through Wis. Stat. §§ 757.295 and 757.45, that referral agreements between an attorney and a non-attorney are contrary to public policy." 295 Wis. 2d at 645, 722 N.W.2d at 166 (emphasis added). Although § 757.45 specifically states that it is unlawful "to agree to divide" a fee with an attorney, the distinction is one without a difference. As with the solicitation of legal business or sharing attorney fees, the policy with respect to video gambling is clear: it is unlawful to set up, operate and collect the proceeds from video poker machines that make payouts. Therefore, it follows that an agreement to do these acts is contrary to public policy and is illegal.

Superior half-heartedly argues that voiding this contract would run counter to public policy because it will encourage bar owners and gambling machine vendors to breach their existing contracts, leaving the aggrieved party with no recourse, thus causing an unnecessary disruption in commerce that will snowball into a significant loss in tax revenue. This argument presents the court with a hanging curve ball over the plate, but I'm not going to swing. Suffice it to say that I do not share Superior's concerns. Bar owners and amusement machine vendors long have known that video poker machines that provide payouts are illegal in Wisconsin, yet they still contract for such services. It is not, and never has been, the role of the courts to ensure

17

fair bargaining between parties to such contracts.  *Hiltpold*, 98 Wis. 2d at 718, 298 N.W.2d at 220 ("Such a contract is void and courts will leave the parties where they find them").  Those who enter a contract for illegal activity do so at their own risk and likely have extralegal means for enforcing those agreements.[3]  If Kremer's double-cross of Schmitz has any ramifications beyond the instant case, I have no doubt that the affected groups will find a way to deal with it because if Superior is to be believed, there is too much money at stake not to.  Regardless, Wisconsin's clear mandate against video gambling trumps Superior's interest in enforcing its contract with Dick's Bar.

## V.  Severability

In a final attempt to preserve its breach of contract claim, Superior asks the court to sever the illegal provisions of the contract and enforce the parties' agreement with respect to the 6 lawful amusement machines.  As explained above, the general rule in Wisconsin is that if a contract is illegal, it is void and the court will leave the parties where it found them.  *Kryl v. Frank Holton & Co.*, 217 Wis. 628, 259 N.W. 828, 829 (Wis. 1935) (quoting *Lowe v. Crocker*, 154 Wis. 497, 143 N. W. 176, 178 (Wis. 1913)) ("If illegality permeates a contract so that it furnishes the reason for it and the foundation upon which it rests, then the whole contract is void and courts will leave parties where they find them."); *Cornwell v. City of Stevens Point*, 159 Wis. 2d 136, 142, 464 N.W.2d 33, 36 (Ct. App. 1990) ("the courts will not intervene in the

---

[3] The video poker machine industry in Wisconsin might be an arena in which "relational contracts" customarily would hold sway.  *Cf.* Macauly, Non-Contractual Relations in Business: A Preliminary Study, 28 Am. Soc. Rev. 55, 61, 63 (1963) (in the business community, social pressure and reputation often are used instead of formal contracts and judicial enforcement in executing mutually beneficial agreements).

relationships [parties to illegal contracts] have created").  Although "a party not in pari delicto may have restitution of benefits conferred under an illegal contract," *Hiltpold*, 98 Wis. 2d at 716-17, 298 N.W.2d at 220, Superior is equally, if not more, at fault in this case.  It knowingly entered into an illegal contract to provide video poker machines that made payouts.  Further, because Superior never fulfilled is obligations under the contract, Dick's Bar never received any undeserved benefit for which Superior should be compensated.

Under some circumstances, Wisconsin courts have applied the doctrine of severability to allow one party to enforce the legal portions of an otherwise illegal contract.  The general rule as to severability was stated in *Simenstad v. Hagen*, 22 Wis.2d 653, 661, 126 N.W.2d 529, 534 (Wis. 1964):

> A bargain that is illegal only because of a promise or a provision for a condition, disregard of which will not defeat the primary purpose of the bargain, can be enforced with the omission of the illegal portion by a party to the bargain who is not guilty of serious moral turpitude unless this result is prohibited by statute . . .

*See also* Restatement (Second) of Contracts § 184 (1981) (stating the rule of partial enforcement with the omission of an offending but not essential provision).  The Wisconsin Supreme Court has continued to apply this rule in more recent cases, holding that holding that "the severability analysis requires an examination of the controlling statute."  *Baierl*, 245 Wis.2d at 642, 629 N.W.2d at 282.  The court went on to explain that "[w]here a statute is intended to protect one party to a contract, that party may seek enforcement notwithstanding the violation of the statute enacted for their protection."  *Id.*, 245 Wis. 2d at 643, 629 N.W.2d at 283 (finding that landlord who includes prohibited attorney's fee provision in residential lease may not enforce lease against tenants who prematurely abandoned rental property).  *See also Dawson v.*

*Goldammer*, 295 Wis. 2d 728, 739-40, 722 N.W.2d 106, 111 (Ct. App. 2006) (citing same and allowing tenant to sever lease containing illegal attorney's fees provision and enforce remaining legal terms because regulation at issue designed to protect tenants).

Although it would be relatively easy to enforce the contract in this case only with respect to the legal machines, doing so would defeat the objectives of the anti-gambling statutes and reward Superior's illegal behavior. It is obvious from the fact that 90% of the total revenue to be generated by the machines placed by Superior would come from the video poker machines that the primary purpose of the parties' contract was to share in the proceeds of illegal gambling.[4] Enforcing the legal provisions of the contract to protect Superior's remaining interest in an insignificant portion of the overall contract is not what Wisconsin intended in allowing the severance of illegal contract provisions. The anti-gambling statutes were not designed to protect parties like Superior.

In sum, because the contract in this case is "so permeated with illegality," the court will leave the parties "just as it found them" and not enforce any portion of the contract. *Schara v. Thiede*, 58 Wis.2d 489, 496, 206 N.W.2d 129, 133 (Wis. 1973) (citations omitted). Accordingly, Dick's Bar's motion for summary judgment will be granted and Superior's breach of contract claim will be dismissed in its entirety.

---

[4] It borders on self-evident that the payouts are what make the video poker machines so popular with bar patrons, thus spurring the disproportionate use of and income from these machines compared to the others. After all, if video poker machines that did *not* make payouts were even close in popularity, then one would expect taverns to use the legal machines instead.

ORDER

IT IS ORDERED that defendant Dick's Bar's motion for summary judgment, dkt. 15,

is GRANTED.  The clerk of court is directed to enter judgment in favor of defendant and close

this case.

Entered this 29th day of October, 2010.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge